Good morning, your honors. May it please the court, my name is Rachel Fazio, and I represent the plaintiffs in this matter. With me at counsel table is my co-counsel, Sarah Ullman. And at this time, I would like to thank the court for expediting the hearing on this appeal and to reserve five minutes for rebuttal. This case presents distinct and separate legal claims under the National Forest Management Act and the National Environmental Policy Act. At the center of these claims is a rare native burn forest species known as the blackback woodpecker. With regard to the NIFMA claim, here we have a forest plan, the 1988 Lake Tahoe Basin Management Unit forest plan, which states in plain language the requirement to ensure species viability by ensuring the viability of management indicator species, which includes the blackback woodpecker. And yet the Forest Service unreasonably insists there is no such requirement, and as a result has failed to prepare an analysis to determine if the requirement is being met. But are we talking about a requirement either at the project level or at the planning level? Actually, Your Honor, any forest-wide requirement is directly relevant to the legality of a particular project. Well, but just a minute, but just a minute. We've got two levels, don't we, that we have? We have a planning level and a project level? Yes, there are two levels. And they did evaluate what we had to do at the planning level. I think everybody agrees to that, correct? I cannot agree to that because I don't understand the question that you're asking me. Well, there's a planning level at which the government goes forth and does what they have to do, and then there's a project level, which is what we're talking about in your brief, isn't it? Actually, it's somewhat of a combination of the two. The forest plan that was written in 1998 includes a requirement to ensure viability. In order to know whether viability is being ensured or whether any particular project threatens the viability of a particular species, there needs to be an analysis that establishes the minimum threshold to maintain viable populations. Now, that analysis could take place somewhere other than the Project EA, but it must exist in order to be referenced so that we know if removing 62% of all the suitable habitat available on the national forest for a given species threatens the viability of that species. How much suitable habitat was there before the fire? Before the fire? Presumably, before the fire, there was very little. I think your brief said there were a few parcels left over from 2002 or something, but there wasn't, within this particular forest, there wasn't apparently much suitable habitat. What we know from the EA is that at the time the EA was written in 2010, there was the suitable habitat that was created by the Angora Fire, which is 1,858 acres, plus 302 acres, I believe, from two pre-existing fires in 2002. We do not know what the suitable habitat available to the species was prior to the Angora Fire. That information is not in the EA. So I cannot actually answer that question, and this is because blackback woodpecker habitat is ephemeral. It only remains suitable for a certain period of time post-fire. So those fires in 2002 now no longer are considered suitable habitat because they can't support the species because the species depend on bark beetles that come to a fire area after the fire recently burns, and once the levels of bark beetles go down, the birds can no longer live there because there's nothing to eat to support them or their babies. So we know that the 2002 fires are no longer suitable now. The only suitable habitat that currently exists on the forest is that which burned in the Angora Fire. And what the government has told us is they're going to remove over half of it, and they have not done the analysis to determine whether or not that will threaten the viability of the species as they are required to by the forest plan. I read your stuff, and it seems to me that ER 19, you put in an amendment to the Sierra Nevada EIS. And in the 2007 amendment to the Sierra Nevada EIS, it says that at the project level, there is no requirement to track trends of species to evaluate viability. Now, I guess my worry is that if there's no requirement to track these species, then I'm trying to figure out why all these multiple provisions that you suggest are the problem, are really a problem, because none of them relate to the project level. Well, Your Honor, actually what the 2007 MIS amendment states is that there is no requirement for monitoring at the project level. No requirement to track trends of species to evaluate viability. Are you quoting from the MIS? Yes. At ER 19. Okay. Are you saying that the requirement to track is the same as the requirement to monitor? Yeah, the MIS amendment did nothing to alter the viability requirement of the forest-wide forest plans. And it says so by its specific terms. So if they're talking about tracking, they're talking about MIS monitoring, monitoring of the MIS species. What we are discussing is an analysis at the forest-wide level, not the project level, that informs us as to whether or not the duty to ensure viability is being met. So it's not saying that you must perform this viability analysis whenever you do a project. What it is saying is that when you have an MIS species and you have a duty to ensure viability, there must be some assessment made as to the minimum threshold of habitat that's required to ensure the viability of a given species. What do you have to do to do that? Well, as this court has repeated in numerous cases, including the Lands Council v. McNair, what needs to be done is to determine the quantity and quality of habitat necessary to support the minimum number of birds, in this case, which will perpetuate the species in perpetuity on this national forest. So you have to ensure that there's a minimum amount of habitat to support a minimum number of birds to ensure the continued existence of the species on this national forest. So that doesn't have anything to do with project-level monitoring. That has to do with recognizing on the forest level how much habitat you need to support a certain species' continued existence on the forest. So it's not project-level versus planning-level, it's there is an analysis that must be done and it can inform each project. And if you have a project like the Angora Project, which completely removes 62% of all the suitable habitat available on the national forest, then you must ensure that that's not going to push the species past this threshold. It's a pretty basic analysis and they refuse to do it. In their EA, they indicate that it's possible that up to 18 pairs will be supported by the forest that is left behind after the logging, but that number is meaningless unless we know whether 18 pairs is enough. It seems to me that your argument is the same one that was made in Carleton. There's a dissent in Carleton. The dissent in Carleton seems to be your argument. And yet when I read what it said in Carleton, we said the sole MIS requirement that is applied at the project level is the assessment of the habitat for MIS. And there is no monitoring requirement for MIS at the project level. Right, there is no monitoring requirement for MIS at the project level. That's exactly what you're arguing here. No, I'm not, your honor. I am arguing that they need to prepare a viability assessment. They can do that outside the context of a project EA, but that assessment must exist so that it can inform as to the legality of the project that they are implementing. It is a very different thing. They do not have to go out and try and find the birds in the Angora project area. They simply need to prepare the analysis they prepared in McNair where they determined that there's a certain level of habitat would support a certain number of birds and that certain number of birds was enough to ensure the viability of that species on that national forest. You take that analysis and you compare it to what is going to be left after the challenge project. And if the numbers work out, then you can affirmatively state we are meeting our viability requirement. If the numbers don't work out, then you probably need to adjust your project in order to comply with the forest plan requirements as NFMA dictates. Well, but aren't we required to defer  of its forest plan? Which forest plan are you referring, your honor? The forest plan here provided. The 1988 Lake Tahoe Basin Management Plan. Yes. Yes, as long as their interpretation is reasonable. Their interpretation in this case is not reasonable because it is contrary to the plain language of the 1988 forest plan. Okay, so if I find the 88 forest plan ambiguous, then I would defer. Yes, but it would be utterly impossible to do so because the language is entirely clear. The language from the 88 forest plan, the most clearly stated provision that addresses the argument by the forest service that it must be contained in the standard and guidelines, although we do not agree with that. Let me quote the language for you. And let us know where it's from. I am drowning in documents and having difficulty keeping the players straight, so. This is from the final environmental impact statement for the land and resource management plan for the Lake Tahoe Basin Management Unit, which is ER 14, where it clearly states that it lists out some forest wide standards and guidelines, which are also common to all alternatives. This is on page 2-14. This is the FEIS for the forest plan, which is discussing all the alternatives that were considered, including the one which was chosen. And it clearly states that for wildlife and fish, maintaining viable populations of wildlife and fish indicator species is one of the most significant forest wide standards and guidelines, which applies to all alternatives. So, clearly. What page is that? That's page 2-14. On ER 14? On ER 14. Thank you. I've got that. And that's really the most distilled and clearly stated place in the forest plan where it says, look, this is a forest wide standard and guideline, and it is common to all alternatives, including the chosen alternative. We are required to, and we will, maintain viable populations of wildlife and fish indicator species. You've only got six minutes left. Do you want to go to your other issue? Sure. It's up to you, but if you want to discuss the NFMA, I think you want to. Yeah, I mean, I think it really, it boils down to this. Whether the forest plan contains a requirement to ensure viability. And if it does, the case law is clear that the duty on the Forest Service is to do the appropriate analysis that can inform project decisions and can instruct as to whether or not they're actually meeting that requirement. We also have several NEPA claims in this case. We argue that an EA analysis is deficient because the defense improperly dismissed from detailed consideration an alternative that would have maintained all snags in logging units that are larger than 15 or 16 inches in diameter. And the Forest Service violated this requirement because they improperly dismissed this alternative from detailed consideration using an erroneous and unsupported assumption that every single tree, every single tree in the forest would fall by year 20. And this was not the same assumption. Well, actually this was not the same data-based criteria they used to evaluate the no action alternative and the proposed action, which shows that 80 to 100 snags per acre would remain standing. This infected the dismissal of this alternative on the basis of fuel loads because it created an over-exaggeration of the amount of fuel that would be on the ground. I'm trying to figure out, given native ecosystems, why, it seemed to me there, the agency at least considered a no action alternative and the preferred alternative. And I guess I'm trying to figure out why this is any different because we held in native ecosystems that they were not arbitrary or capricious. Well, I suppose that's because in native ecosystems, they did not improperly dismiss an otherwise reasonable alternative from detailed consideration. Native ecosystems clearly stands for the proposition that they are required to fully consider all reasonable alternatives per Bob Marshall case. Well, it seemed to me that they, in native ecosystems, they only considered a no action alternative and a preferred alternative, not every alternative. No, it's all reasonable alternatives. And if you're going to dismiss one from detailed consideration, then you have to have an appropriate reason for doing so. The difference in our case is there was not an appropriate reason for doing so. In our case, they used an inappropriate criteria to dismiss the 15 to 16 inch diameter limit from detailed consideration and then utilize a different criteria to evaluate the other two alternatives. This type of skewed analysis is not appropriate under NEPA and is not permitted. Well, I'm well out of my depth because I tried to plow through this and I read the reason given. I mean, they identified reduced removal of snags and used the 16 inch diameter measure. And also, that's in the notice of decision. And in the final environmental assessment, talked about the reduced removal of snags too. And it seemed to me it really didn't seem to be dependent upon that presumption. They started measuring right away. I mean, before any of the snags would have fallen over. I had a hard time tracking through the language, but looking at, it was page 2-3. It didn't, it wasn't so clear to me that in fact that was based on the erroneous premise. I don't know if that language looks familiar to you, but is there something you could point me to that? The page which establishes that when they did their preliminary assessment of the 16 inch alternative. Well, I think you're right with regard to the preliminary assessment, but that's the part point of preliminary. Then they come out with the final and. They didn't do a different assessment other than the one that's in the record at ER-7. And it's page AR-1561. That was the only assessment of the 15 or 16 inch diameter limit that they prepared. Because they did that assessment based on the all snags fall. And they said, ooh, fuel loading is too high. And they never came back and revisited that alternative because they dismissed it from detailed consideration. This was the only consideration they gave it. And it was based on a faulty unsupported premise because the analysis that was updated and utilized in the EA for the no action alternative and the proposed action, which were considered in detail, states that 80 to 100 of the largest snags, snags over 15 inches in diameter, would remain standing 20 years post-fire. But they also said there's too much fuel immediately from day one, not depending upon any. No, that actually is not true. I'm not sure what I think I'm reading is. What, where are, there's, I mean, in the record, there is, it establishes that the current condition in the project area is actually, there's no risk for fire, no increased fire risk from the current condition of nothing. And their analysis of the no action alternative, they actually, it's comparable, and even in some cases represents better fire conditions, better conditions for low severity burn than the proposed action would result in 20 years post-fire. So I'm not quite sure what sentence you're reading on this page that leads you to believe that the 16 inch diameter limit was properly dismissed from detailed consideration. If you could point me to that sentence, I would be happy to respond to it. But the 36 tons per acre, the statement about 31 down logs per acre, that's all premised on their erroneous assumption that all snags would fall. I guess I'm starting, this is on 2-3 or two, whatever, three, and it says they looked at three timeframes, immediately after project implementation, 20 years after project implementation, and 50 years after project implementation, and blah, blah, blah, blah, blah. And I understood the reference to, in the next paragraph, all of the remaining dead trees fall after product implementation. Project implementation was referring to the first time period, not the second. No, it's referring to the 20 years, and that's evident if you look at the page that I previously cited at ER-7, page AR-1561. The trees don't fall immediately after the fire. Yeah, but that's sort of the point. If they say the problem is immediately after the fire implementation, there is still too much left. No, that is completely contradicted by the record, and if I could find the page where it says that, oh, here we go. Page 3.1-2, ER-4. Currently, the project area is at low risk for fire behavior that would substantially threaten the community of South Lake Tahoe or associated important vegetative and aquatic habitat. That is their conclusion about current. That is the state of things when they wrote this EA. What was the page number again? It's 3.1-2, and that's at ER-4. It's at the very bottom of the page. There is no risk of fire behavior that could threaten the communities now. That's why they project everything out 20 years, because it actually takes time for trees to fall after they burn, and the biggest trees stand the longest, and they estimate that 80 to 100 of them will still be standing 20 years post-fire. That was the proper criteria to use when evaluating alternatives. They did not use that criteria in evaluating the 15 or 16 inch diameter limit. I mean, let me, I guess I'm trying to figure out, it seems to me that if I remove the assumption of an all snag fall rate, that the agency's preferred alternative accomplishes the Forest Service goals better than your alternative. Are you substituting your judgment for that of the agency? Well, I don't know. That's what I'm trying to figure out. It seems to me it accomplishes all those goals of avoiding the intense fires better. It doesn't, and well, actually, who knows, because they didn't do the analysis, but I would argue, and did so in my briefs, that an alternative that would really remove 83% of the snags in the project area would actually equal or maybe even perform better than the proposed alternative. The only way we get to know that is if they do the comparative analysis by giving detailed consideration to that alternative. They refused to do that, and they dismissed it using an improper basis. So it's not for this court to decide, oh, that sounds like, you know, hey, maybe that would be better, because it's the agency's job, and they didn't do it. Well, I guess my worry is, I can assume, based on your argument, where you're going, I'm not sure I agree with you, but I think that all that is required is for the agency's consideration of the alternatives to be reasonable. And it's not in this case. That's your argument, I understand. They can't use a different criteria to dismiss one and use a more refined database criteria to support the other two. They just can't do that. That's, that is the definition of unreasonable. And I guess at that point, since I'm way over, unless there's other questions, I'll reserve for rebuttal. Whatever you'll give me. Yeah, I know. I'll reserve whatever you're graciously willing to provide me for rebuttal. Thank you, Your Honors. Thank you. Ms. Fazio. May it please the Court. My name is Vivian Wong, and I represent the federal appellees. With me at council table is James Rosen from the USDA Office of General Counsel. Your Honors, I would like to begin by clarifying some of the factual context that I believe appellants have misrepresented. They, Ms. Fazio continues to quote this supposed 62% removal of supposed habitat. But in fact, the record demonstrates that the Angora Restoration Project was designed in order to retain and maintain abundant habitat for the woodpecker while maintaining and improving habitat for other species of conservation concern, including the California spotted owl and the northern goshawk. And in fact, out of the approximate 3,000 acres at issue, there are approximately 1,000 acres that are retained as suitable habitat for the woodpecker. And in addition to that habitat, even in the areas of the forest that are being treated to reduce the risk of a future catastrophic fire, the Forest Service is maintaining 12 wildlife snag zones, which are areas of high burn severity, the sorts of habitat that the woodpecker, according to appellant, prefers. And in those areas, there is limited or no removal of these snags. Even outside of these wildlife snag zones, as the record shows, the plan retains an average of the four of the largest diameter snags per acre. And so in all of, and in a cumulative sense, in evaluating not just the Angora fire area, but also the territory of the adjacent forests that have been burned between 2001 and 2007, the Forest Service environmental assessment demonstrates that there are approximately 211,000 acres of severely burned forests that still remain. Is there anything that tells us what that means for the woodpeckers? Yes, your honor. I, the bioregional management indicator species monitoring that's in the record is a range-wide and different spatial level evaluation of sort of the stability of the population distribution of the woodpecker. And this data demonstrates that over the past decade, the population distribution of the woodpecker has remained stable. What's done is that the Forest Service in cooperation with other conservation groups, sets up different sample stations across the Sierra Nevada range. And it looks at detections of woodpeckers in various sample size through methods such as spotting, netting, and other. Does that tell us about number or areas where they're found? It tells us about their presence across a historical range. And the value of this information, your honor, is that it enables to tell that the historic distribution range of the woodpecker has remained similar to the current population distribution in terms of detections across this range. And so it's an indication that the population levels are stable. These birds are not necessarily easy to spot. And this is the method that the Forest Service adopted as the methodology for determining the MIS, the Management Indicator Species Monitoring. And this was the methodology adopted in the 2007 amendment to the Sierra Nevada plans. So how can we tell if the habitat that will remain,  will be sufficient to maintain that level of distribution? Well, your honor, the record demonstrates that based on the historic and the stable population distribution trends, that the fact that this approximately 1,000 acres are being left untreated, or sorry, more than 1,000 acres are being left untreated in combination with these wildlife snag areas where no treatment occurs in the context of the hundreds of thousands of suitable acres surrounding areas indicates that this project does not have a negative effect on the woodpecker habitat. And that is- Where do I go to find that conclusion? Your honor, this is in the environmental assessment and also in the MIS report, which is... So in the bioregional MIS report, that's at the supplemental excerpts of record 373, that discusses the population monitoring strategy and the sort of the stability of the distribution over time. Well, let me tell you my concern is that I've gone through not all of the record and even some of the pages I've turned, I can't say that I understood much of what was being said on the page in front of me, but I've been trying to get my hands on something that says, that reports on or reaches a conclusion with regard to viability in terms of number of woodpeckers, and I haven't found it. Well, your honor, the viability, I believe that's what you're referring to as a sort of a viability requirement or a certain threshold number, there's not a particular number that's been identified in the decision notice as this threshold. However- I haven't even found a statement that says a viable population would be maintained. Your honor, as Judge Smith was discussing earlier, at the project level, what the Forest Service is required to do as a matter of law, as a matter of complying with their NFMA obligations, is to discuss the effects on habitat of the woodpecker, not to maintain viability at a certain threshold number. Well, I'm looking at what I think is the forest plan that says the Forest Service must manage habitat to at the least maintain viable populations of existing native and desired non-native species, management indicator species, so on and so forth. That suggests to me that the species is maintained. What level of, what numbers, what viability means, I don't know, but I haven't, I didn't find anything that told me just that, that the species will be maintained. Well, your honor, as an initial matter, I respectfully disagree that the language that you're citing to is actually creating a viability requirement at the project level. Forest Service must manage? That's not a prediction, that seems to be a command. Well, your honor, as this court held in the Castaneda case in 2009, the presence of a few isolated provisions, even if they're cast in mandatory language, does not transform suggestive guidelines into biting regulations. So you're telling me it's not required that the population be maintained? Your honor, our position is that at the project level, the Forest Service's duty, as set out in the 2007 MIS Amendment and elsewhere in the record, at the project level, the duty is to assess the effects on habitat of the project. Now, at the plan level, this viability requirement is something that, or at the plan level requirement, this is something that the Forest Service complies with through a variety of monitoring methods. They do it through sort of bioregional trend monitoring, through assessing change trends in vegetation, in monitoring of various species of conservation concern. But the language that you're quoting from, your honor, appears in chapters three and four of the Forest Plan, which are the sections of the plan that are summaries and analysis of the management situation. They discuss the existing situation of Forest Services. Chapter four, which the appellants also cite, provides management direction in desired future conditions. These are not, this is not language, your honor, that appears in the standards and guidelines section of the Lake Tahoe Basin Forest Plan. And that's. I don't understand anything you just said. I believe the word must. What's it mean? If it appears one place and not another, I mean, are we supposed to say, well, they were just making it up in that other section? And frankly, I haven't found anything that tells me a habitat's going to be maintained, stands are going to be maintained. That may be enough, but I haven't seen any statement that says it is enough, or we have reason to believe it will be enough. And it's probably in there someplace. I don't quarrel with that, but I keep turning pages and I haven't found it. So point it to me, or point me to it. Your Honor, if I may address your discussion of the must language. I would like to refer again to this Court's holding in the. Well, let me first say, I gather it doesn't appear there. And your argument is that it doesn't have to because, as Judge Clifton said, must doesn't mean must. Or we can ignore the must. Your Honor, I'm not saying that we should ignore the language, but I believe that as this Court held in the Carlton case, which assessed very similar language, in Carlton. Carlton said will, and this says must. I don't know whether that makes a difference or not is another question. But it is similar, except Carlton said they will maintain it as some would look at it as predictive. And this case says must, which some would look at as mandatory. I don't know. Well, your Honor, in the Carlton case, the plan language at issue said that the project, you know, or said that the Forest Service will provide habitat necessary to maintain well-distributed viable populations. So the will provide and the necessary to maintain sounds similarly mandatory. But the Court, again, held that because the Forest Service will provide habitat. And what I'm reading isn't talking about habitat. It's talking about viability of the species. And that's where the word must appears. I understand there's clearly a connection between available habitat and the species being maintained, but I haven't seen anything that explains to me why it is that the language must in connection with viability of the species is somehow trumped by a more predictive not commanding statement with regard to maintaining habitat. Nor, and this is the factual piece that I've been missing, although like I say, I think it's probably there, have I found anything that really says or connects or gives me a formula for this much habitat is enough to maintain this much species or any viable amount of species. And presumably that connection is well established as a scientific proposition, and maybe they don't need to say it because they're scientists, not lawyers. But I haven't found it. Well, Your Honor, I think that in the MIS report, and I apologize, I don't have those particular page numbers up here with me, it does conclude that out of the general habitat effects that these effects will not negatively affect the habitat. With respect to what Your Honor is looking for. That's the species. I mean, what is it that links the species and the habitat together? Well, as this court discussed in McNair, there are, the Forest Service is given ample discretion in terms of their expertise in determining the best methodology by which to fulfill their regulatory duties. So, for example, one way in which we can assess the health of a species may be what is referred to in these cases as a proxy on proxy approach, which would be to assess whether habitat that's suitable for the species is being maintained. And if that's the case, then that is a, that could be, you know, based on a particular record in the situation, that could be sufficient evidence that the viability of a species is maintained. So where's that discussion? Is that the SCR 373? Or may I, I haven't, I'm not manipulating the pages fast enough to get to them. That's sort of what I'm looking for, something that says, okay, I mean, I understand the idea of a proxy. Indeed, the woodpecker is himself, itself, a proxy. So habitat may be a proxy, but where's that discussed? Well, in the project environmental assessment, which would be, this is, for example, on SCR 235, discusses about the, this discusses the Forest Service's maintenance of these wildlife snag zones, primarily located in areas of high burn severity, which provides suitable habitat. But, Your Honor, I'd like to take a step back, and I think that part of what your concern is, is that there must be some link at the project level between assessment of habitat and this supposed viability requirement. But as Judge Smith pointed out, this viability requirement just simply does not exist at the project level. Well, oh, wait a minute. I understand that it doesn't have to exist within the confines of a particular project. But if you say we can go into each project with blinders, then you've got no viability. Presumably, the project has to be supported by, it's a bigger environment than the confines of this project. I accept that. But where's the reference to how viability will be maintained by the surrounding forests? The Forest Service, in complying with its plan level duty to ensure viability, does conduct wider level monitoring, and if the Forest Service were to detect that there were aberrations in the trend, for example, in the population distribution trend, that might be the point at which the Forest Service says, you know, we need to do some more intensive analysis. The challenge here is that this project doesn't comply with the Forest Management Act because you've got a requirement to maintain viability, and I'll accept either habitat or species in some fashion, and that this plan doesn't address or satisfy that requirement. And so I'm looking for something that tells me. Now, the answer may be it's taken care of because of this forest over here. But I haven't found that either. I just haven't found the explanation. I thought you were saying that it did say that there was no adverse effect upon the habitat. Was that not – you were not saying that? Your Honor, I'm – would you mind repeating that? No. I thought you were saying earlier that the report states that there is no adverse effect upon the habitat. Is that – could you tell Judge Clifton that you don't have to say there's no adverse effect upon the species because that there was a – habitat was the proxy for species? Your Honor, I believe what I was referring to, I believe what Your Honor is asking is the project-level duty to discuss effects on management indicator species habitat, which the record has done in terms of assessing both the short-term impacts of the removal of some of these trees and areas to address wildfire risk, but also maintaining a lot of these snag habitat areas for the woodpecker. And so you're correct, Your Honor, that the Forest Service did conclude that in general there would not be a negative effect on the trend numbers of the woodpeckers as a result of this very limited project, and that in addition, the record also demonstrates that over the next five additional years – and again, this is in the project environmental assessment on SCR pages 234 and 114 to 115 – discusses how over the next five years, in fact, additional snags would be created in the untreated areas because trees that survive the immediate effects of the fire will succumb to drought and pests and fall or die over time, which provides additional habitat for the woodpecker. And so all of these facts in combination and based on the Forest Service's expert analysis was that there would be abundant habitat maintained for the black-backed woodpecker. We've got three minutes. Could you turn to the question that we discussed at the end of the last argument about the inconsistency in the report or the dismissal as an alternative of the plaintiff's alternative? Certainly, Your Honor. The – what appellants are essentially asking the Court to do here is to substitute their interpretation of the data for that of the Forest Service. And as Your Honors know, the standard is well established that in assessing areas at the boundaries of science and particularly in areas of special expertise, we defer to the agency's assumptions. Now, what they're discussing as the supposed inconsistency is actually their conflation of studies that were done at two different points in two different contexts. The initial scoping that they're discussing was based on field observation and other conditions that were observed on the ground regarding which trees were left standing or fallen immediately after the fire. But these studies were later refined using forest vegetative studies computer modeling. And in fact, it is – this modeling incorporates algorithms that are essentially similar to the all snags fall assumption that they claim was biased or skewed. The computer modeling actually incorporates a rate of, for example, a 95 percent fall rate within 17 years for Jeffrey pine trees or a 95 percent fall rate within 30 years for white fir and red fir trees. And these are similar numbers. And in the context of the Forest Service's conclusion that even at an action alternative of leaving 16-inch diameter trees, that would still lead to an unacceptable fuel loading condition in terms of the ability of firefighters to suppress fires in the future. Additionally, the fuel modeling and the alternatives assessment was not just done based on fuel loading alone, but also on predicted fire behavior and the ability to survive – to suppress future fires. There's fuel stand data that appears, for example, at pages 389 – starting at 389 of the supplemental excerpts that discusses how even leaving an additional few large trees per acre, as the appellants might suggest, that those trees falling over time, each weighing more than a ton, would still create a condition of fuel loading on the ground exceeding the 15 tons per acre threshold that the Forest Service determined was the level of acceptability in terms of protecting, for example, the wildland urban interface defense zone. This is – the Angora fire in 2007 destroyed more than 250 properties. This is an area that's close to communities, close to properties, and essentially the Forest Service concluded, based on the studies of their silviculturists and fuel specialists, that the alternative chosen was the one best designed to meet their statutory goal of protecting the forest and balancing the various competing needs. And notably, Your Honors, appellants, while they contend that the analysis was skewed and that they – their 15-inch diameter should have – diameter reduction should have been evaluated, they actually don't assert that even their alternative would have met the fuel loading limits that would be acceptable, because it's simply not the case. And in fact, the Forest Service reasonably concluded, based on their expertise, that the project was the best way to fulfill the multiple competing goals of preserving safety for firefighters, for recreational visitors, for residents, as well as restoring ecological conditions, reducing the invasive pests and other problems that would affect the forest health.  Thank you, Your Honor. If I could, if I could, Judge. I'm troubled by some of the same things my colleagues seem to be, and especially Judge Clifton's questions about the planning level versus the project level. And so I read through this stuff, and I'm sure that it's more than what I can understand, like you two understand it. But I gave it my best effort. So I want to ask you a couple of questions that really concern me. If the requirement to assess the viable population level only exists at the planning level, when, if ever, will those populations level actually be assessed? And when will the public have a chance to get a weigh-in on that? I mean, it seems to me your argument is we've done what we need to do in planning, and we don't need to do anything else. And I'm like Judge Clifton. I don't think the project level stuff says anything about it. So when will we know anything about it? When will we be able to weigh in? The Forest Service shouldn't be able to just do whatever they want. That's not what it was set up for, the act. Your Honor, I believe that as part of its compliance with NEPA, in terms of fulfilling those procedural obligations to fully disclose environmental assessment, that in complying with the regulatory duties to assess, for example, cumulative impacts and long-term impacts on habitat, that that would be an instance in which the Forest Service, if it determines that there are significant negative effects in terms of cumulative impacts, in terms of a project area, the range-wide area, the Sierra Nevada range, or over time, that would be a situation in which they would have to solicit public comment. And if they determined or if the public interested participants submitted comments expressing concern, may lead the Forest Service to conclude that there are significant negative environmental effects, such that it ought to prepare a much more comprehensive and detailed environmental impact statement. However, in this case, it was environmental assessment that was prepared because the Forest Service determined, based on all of the evidence before it, including responding to evidence from public comment, that this project would not have those sorts of significant impacts on the environment. And as the regulations state, an environmental assessment is intended to be a concise public document. It is not intended to be conflated with the requirements set for an environmental impact statement. And so at that level, that would be one instance in which the public would be able to engage in a sort of more comprehensive, longer-term, broader, spatial-scale discussion of effects. Additionally, there are other requirements that the Forest Service must comply with at the plan level in terms of performing range-wide monitoring for the health of the species. The MIS, the Management Indicator Species Habitat Assessment, at the project level is only one component of this broader umbrella of monitoring. There are studies done on key ecological conditions, on species of local interest, on change detections of vegetation structure, species composition. And at these plan level in Sierra Nevada, wide-level studies were to indicate that there were certain aberrations or negative trends that would trigger, for example, Forest Service action, and that might be something that the public then could participate in. And a final point, Your Honor, that I think is also relevant is that this plan, the Angora Restoration Project, was designed to improve habitat for species that are – for whom viability is a concern, species that are listed as Forest Service-sensitive species, like the spotted owl in the northern Gossok. The woodpecker is not one of these species. It is not listed as a threatened or endangered species. It is not listed as a Forest Service-sensitive species because it has not been determined as a species for which viability is a concern. Thank you. Thank you, Your Honor. Thank you, counsel. We've gone considerably over for Forest Service. We'll give you some time. I will be as succinct as possible. First off, the project is actually removing 62 percent of the blackback woodpecker habitat. That is not a misrepresentation. That is taken directly from the EA. There are only going to be 713 untreated acres of suitable blackback woodpecker habitat within the analysis area that will be retained. Within this project area? Within the entire national forest because this is – Within the national whole planning area? It's within – Forest area. Yes, it's within the whole planning area, but the only available habitat is from Angora Fire Area now because all other habitat that exists is no longer suitable. This is all in the EA, and it's – Where? Yeah, ER4. The statement that I – the 62 percent comes from 3.6-65, and there is just generally a discussion of how they assess habitat and how much would be left and whether – The 62 percent didn't seem to match up to the numbers you gave. You gave numbers as well as that percentage. There's – They came fast, so are you going to be right? Yeah, it's okay. What were the numbers? The fire in general burned 3,100 acres. Of that 3,100 acres, it burned at low, moderate, and high severity. I know, but you gave a number and said – Yeah, there's 700. There were X areas, and there's now Y. There were 1,858 acres of suitable blackback woodpecker habitat. That's of all quality. And now there's what? And after the project, there will be 713 untreated acres. Now, when she's talking about these wildlife snag areas, that's included in the 713 acres, and there's also an additional hundred or so acres where they're going to do some treatments and therefore reduce the suitability of some acres. But the 62 percent is a correct number. The 62 percent represents what was available after the fire or as a result of the fire? After the fire, there is 1,858 acres. But before the fire, when they talked about viability of the woodpecker? They don't actually talk about viability of the woodpecker in the EA. No, they do not. It's nowhere in the EA. And with regard to the representations by the government that everything is fine with the species and this is a species we don't need to care about, in December, the California Fish and Game Commission listed the blackback woodpecker as a candidate species for listing under the Threatened and Endangered Species Act. And just this month, a proposal for listing the blackback woodpecker as Threatened or Endangered under the federal EA was filed. This species is extremely rare and exists only in half of the areas that suitable habitat exists throughout the Sierra Nevada. So any given fire area you go to, you only have one 50% chance of finding the bird in the first place. That makes angora pretty special. The other thing that the defendants did up here is they basically hinge everything about the health of the species on this stable population distribution trend. And as we brief fully in both our briefs, that is a contested finding. But the thing about it that is not contested is that the studies that the Forest Service cites never actually establish any trend for the species. The species is simply too rare to gather enough information. And the only study in there that actually tries to establish a trend establishes a declining trend, not a stable trend. So there's no support for that statement. I thought I read, God knows what I've read, so I thought I read something that did suggest a trend with regard to not numbers but distribution, that is, area. They made the conclusion, yes, the conclusion is not supported by the data. And in their brief at pages 32 to 35, they discuss the studies they claim to rely on, and they admit that none of the studies themselves actually contains trend data. This is a very specific and scientific terminology. They don't have enough information to statistically analyze whether the trend is increasing, decreasing, or stable. It doesn't exist in those studies. They imply that somehow they took the information from those studies and morphed it into something that could establish a trend, but they have provided no methodology as to how in the world that is even possible, let alone how they did it themselves. So there is nothing in this EA that establishes that this project will not damage the health of this population, distribution or otherwise. The only other two points I'd... Two points in 30 seconds. No, I could talk all day on this, as you can probably imagine. No, you can't. No, I would like to, but no. She referenced, the defense counsel referenced McNair, and even in McNair this court established that they needed to make the minimum threshold findings, that that was a requirement. And the reference to Castaneda, Castaneda addressed the viability provision of the forest planet issue in that case. The language is extremely similar to the viability provision in this forest plan, and Castaneda found that it was a requirement and found that they did actually have to make the minimum viability threshold about the number. Thank you. Sorry, sir. Thank you. The case is carried. It will be submitted. All rise.
judges: Reinhardt, Clifton, Smith